UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ARMAND AVERY, individually and on behalf of J.A., a minor child,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SEATTLE and SEVERAL UNKNOWN OFFICERS,<br><br>    Defendants. | CASE NO. 2:22-cv-00560-LK<br><br>ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT |

Currently before the Court are the City's motion to exclude expert testimony, Dkt. No. 19, and motion for summary judgment, Dkt. No. 21. Plaintiffs oppose both motions. Dkt. Nos. 29, 31. For the reasons discussed herein, the Court grants in part and denies in part the City's motion for summary judgment, and grants the City's motion to exclude expert testimony.

## I.    BACKGROUND

### A.    Factual Background

On May 30, 2020, organizers planned two demonstrations in downtown Seattle to protest the May 25, 2020 killing of George Floyd in Minneapolis: (1) "The March for George Floyd,"

scheduled from 12:00 p.m. to 6:00 p.m. on Fifth Avenue, and (2) "The Defiant Walk of Resistance Against Injustice," scheduled to begin at 3:00 p.m. and to go from Westlake Park to the federal courthouse at Seventh Avenue and Stewart Street. Dkt. No. 26-1 at 8–9; Dkt. No. 26-2 at 3. Prior to the demonstrations, SPD issued a May 30 Events Incident Action Plan, which outlined the SPD's operational plans for that day's events. *See* Dkt. No. 26-1 at 2–28; Dkt. No. 24-2 at 29.

Captain Todd Kibbee served as Incident Commander for both demonstrations. Dkt. No. 26-1 at 3, 7; Dkt. No. 26-2 at 3. Among other things, he aimed to "quickly and effectively respond to any crowd management events that [came] to [the officers'] attention," and expected "quick intervention to address assaults or conditions that pose[d] an immediate threat to public safety in line with [SPD] Policy, training, and best practices." Dkt. No. 26-1 at 4. Officers assigned to the demonstrations were told to "facilitate the peaceful expression of [First] [A]mendment rights, preserve order and enforce the law." *Id.* at 16; *see also* Dkt. No. 26-2 at 4. Pursuant to SPD's Operational Plan for the demonstrations, "[t]actics [would] be used to protect the lawful exercise of individual rights" and "[a]ctions by anyone that create[d] significant public safety hazards [would] not be permitted[.]" Dkt. No. 26-1 at 16.

SPD assigned three platoons of officers to "Crowd Management" on May 30th. *Id.* at 7, 15. SPD required Crowd Management officers to carry blast balls and cannisters of oleoresin capsicum ("OC") spray (also known as pepper spray). *Id.* at 17. Crowd Management officers had the authority to use force (including OC spray) as long as the officer had "a specific target." *Id.* at 22. SPD instructed officers to "[w]arn those who attempt[ed] to block and/or obstruct [their] movements not to do so," *Id.* at 20, and reminded officers that "[a]ll force must be Objectively Reasonable and Individually Justifiable," *id.* at 22. SPD also directed officers to "[p]rovide aid to those exposed to OC when feasible." *Id.* at 23.

Bike officers held "the primary responsibility for [p]olice presence during the rally and possible march" and "maintain[ing] a presence adjacent to all rallies and gathering points." Dkt. No. 26-2 at 9; *see also id.* at 31–33; Dkt. No. 24-2 at 29. Sergeant Sean Moore served as the leader of Platoon 1's West Bikes #3 at The Defiant Walk of Resistance Against Injustice. Dkt. No. 26-2 at 6, 8, 9.[1]

    1.  Plaintiffs Are Injured During the May 30, 2020 Demonstrations

After learning about the demonstrations through his parents or his church, Avery decided to attend the events along with his young son J.A.,[2] other family members, and church members. Dkt. No. 39 at 7, 10–12. Less than an hour after they arrived, they found themselves face-to-face with a line of police officers, and following a brief escalation along the line, were both exposed to OC spray. *Id.* at 42, 44–45. The precise timeline of Plaintiffs' movements is not clear from the evidence submitted. However, the Court summarizes the relevant series of events as reflected in the record.

At approximately 2:48 p.m., SPD officers with bicycles formed a line on Fourth Avenue between Pine Street and Olive Way. Dkt. No. 24-2 at 4; Dkt. No. 25 at 2 (Ex. I at 0:43–1:10).[3] Other SPD officers soon joined to support these bike officers. Dkt. No. 25 at 2 (Ex. G at 2:28–2:50, Ex. I at 1:18–1:30). This line of officers then encountered a line of demonstrators from the main demonstration in Westlake Park. *Id.* (Ex. G at 2:35–4:50, Ex. I at 1:30–3:35). About five

---

[1] After May 30, 2020, Sergeant Moore became a Lieutenant, *see* Dkt. No. 21 at 2 & n. 2; Dkt. No. 22-23 at 4, and Captain Kibbee became Assistant Chief, Dkt. No. 32-10 at 2. For the sake of clarity, the Court refers to them herein as Officer Moore and Captain Kibbee.

[2] The record indicates that J.A. was either seven or eight years old at the time of the incident. *Compare* Dkt. No. 30-4 at 36; Dkt. No. 31 at 4; Dkt. No. 39 at 28, *with* Dkt. No. 25 at 3 (Ex. L at 0:01–0:05); Dkt. No. 31 at 9; Dkt. No. 39 at 40.

[3] The body-worn videos submitted by the City have been authenticated by a video specialist in the Forensic Digital Imaging Section at the SPD, and the time stamps visible in the upper right corner of videos are seven hours ahead of Pacific Standard Time. Dkt. No. 23 at 1–3; Dkt. No. 25 at 1–2.

minutes later, at approximately 2:53 p.m., a separate, smaller group of demonstrators approached the line from the opposite side. *Id.* (Ex. G at 5:55–6:07). Several officers met this group and instructed them to join the larger group in Westlake Park through another route. *Id.* (Ex. G at 5:55–6:26). When demonstrators from this second group attempted to proceed through SPD's line, an altercation occurred and officers deployed OC spray at them. *Id.* (Ex. G. at 7:15–7:34). Officers then proceeded to form a second line of bicycles and to push back the retreating second group of demonstrators while repeatedly telling them to "move back" or "get back." *Id.* (Ex. G. at 7:13–7:34).

In the meantime, the first line of demonstrators (which at this point included Avery and his son, *see id.* (Ex. H at 5:55–6:07))[4] increased in numbers and some demonstrators, including Avery, began to verbally engage with the first line of officers, Dkt. No. 25 at 2 (Ex. H at 6:05–7:20); Dkt. No. 24-2 at 5–6 (Avery stating to officers, "I'll beat your ass, I'll beat your ass, I'll beat your ass" while pointing at different officers in turn, and calling the police "pussy ass motherfuckers"); Dkt. No. 25 at 2 (Ex. I at 8:50–13:39; 15:45–17:26); *see also* Dkt. No. 30-4 at 36. At approximately 3:08 p.m., an SPD officer informed Officer Moore that the demonstration would soon be declared an unlawful assembly. Dkt. No. 25 at 3 (Ex. J at 5:08–5:48); *see also id.* at 2 (Ex. H at 20:42–20:47); Dkt. No. 24-2 at 14. At approximately 3:10 p.m., a demonstrator who SPD officers had previously pepper sprayed returned and began verbally engaging with officers. Dkt. No. 30-4 at 36; *see also* Dkt. No. 24-2 at 5, 25, 28; Dkt. No. 20-1 at 3 (Ex. C at 0:00–0:30). After learning that this demonstrator had previously tried to steal an officer's pepper spray, SPD officers on one end of the bicycle line placed him under arrest. Dkt. No. 24-2 at 5; Dkt. No. 30-4 at 36; *see also* Dkt.

---

[4] Avery is 6'1", Dkt. No. 22-1 at 2, and is wearing a black hooded Patagonia rain jacket, a red mask, gloves, and a Nike backpack during the demonstrations, Dkt. No. 22-2 at 7, 12–14, 17, 30; Dkt. No. 24-2 at 5. J.A. is wearing a black hoodie and a black and white mask at the demonstrations. Dkt. No. 22-2 at 10–11. Plaintiffs do not dispute the City's identification of them in the body-worn videos. *See id.* at 7, 12–21, 29–37.

No. 20-1 at 3 (Ex. C at 0:30–1:06); Dkt. No. 25 at 2 (Ex. H at 21:58–22:09); Dkt. No. 32-8 at 13. An escalation between officers and demonstrators ensued. Dkt. No. 30-4 at 36; *see* Dkt. No. 25 at 3 (Ex. K at 0:00–0:11). Several demonstrators, including two female demonstrators (one wearing a black sweatshirt and one wearing a white t-shirt and bike helmet), moved toward the police line. Dkt. No. 25 at 3 (Ex. N at 0:00–0:10); *id.* at 2 (Ex. G at 23:42–23:46, Ex. I at 22:40–22:49). The officers commanded the demonstrators to "move back," *id.* (Ex. I at 22:34–22:39); *id.* at 3 (Ex. K at 0:04–0:08, Ex. N at 0:00–0:10), and officers began pushing their batons against demonstrators, *id.* 3 (Ex. N at 0:02–0:05, Ex. K at 0:04–0:09). At this point, Officer Moore ran up to the line from behind and repeatedly yelled "Move back!" with a blast ball in his left hand and OC spray in his right hand. *Id.* (Ex. J at 7:07–7:24); *see also* Dkt. No. 24-2 at 5. The female demonstrator wearing the bike helmet then shouted "You move back!" while pushing over the line, grabbing an officer's baton, and pushing back against him. Dkt. No. 25 at 2 (Ex. H at 22:10–22:13); *id.* at 3 (Ex. K at 0:09–0:13, Ex. N at 0:10–0:13); *see also* Dkt. No. 24-2 at 5, 18. She again yelled, "Don't push me! You move back!" Dkt. No. 32-7 at 4; Dkt. No. 20-1 at 7 (Ex. G at 0:16–0:23).

At the beginning of this disturbance, Avery moved quickly to his left towards the disturbance, holding J.A. to his right side and approaching until he was immediately behind the female demonstrator. Dkt. No. 32-7 at 5; Dkt. No. 25 at 2 (Ex. I at 22:40–22:50). Then, without verbal warning, Officer Moore deployed OC spray in the direction of this demonstrator. Dkt. No. 20-1 at (Ex. G at 0:22–0:23); Dkt. No. 25 at 3 (Ex. J at 7:24–7:29, Ex. K at 0:12–0:14, Ex. N at 0:10–0:14); Dkt. No. 24-2 at 5, 9, 14–15, 18.[5]

---

[5] Officer Moore also deployed a second short burst of OC spray at a different demonstrator and began to deploy a third spray before stopping. Dkt. No. 25 at 3 (Ex. N at 0:12–0:18); *id.* at (Ex. J at 7:25–7:31); Dkt. No. 24-2 at 7–9, 28.

1   When Officer Moore deployed the OC spray at the female demonstrator in the bike helmet,

2   Avery had his left arm around her waist as she turned away from the spray, exposing his left side

3   to Officer Moore's deployment. Dkt. No. 25 at 2 (Ex. G at 23:48–23:51); *id.* at 3 (Ex. I at 22:47–

4   22:51, Ex. K at 0:12–0:14); *see also* Dkt. No. 22-2 at 29; Dkt. No. 24-2 at 6. Avery had his right

5   arm around J.A., who stood behind his father and the female demonstrator. Dkt. No. 25 at 3 (Ex. I

6   at 22:49–22:53, Ex. K at 0:12–0:14). As Avery and J.A. retreated from the altercation, Avery

7   placed his left hand on or near J.A.'s face and kept his arms around him as they walked away. *Id.*

8   (Ex. I at 22:51–23:08, Ex. N. at 0:16–0:26); Dkt. No. 20-1 at 7 (Ex. G at 0:29–0:30). Moments

9   later, J.A. began reacting to the OC spray's painful effects and received assistance from other

10  demonstrators. *See generally* Dkt. No. 25 at 3 (Ex. O); *see also* Dkt. No. 24-2 at 8, 25. An

11  unidentified officer stepped forward and called out for J.A. to be brought to the officers for medical

12  assistance but was rebuffed by demonstrators. Dkt. No. 24-2 at 6; Dkt. No. 20-1 at 1 (Ex. A at

13  0:00–0:30); Dkt. No. 25 at 2 (Ex. I at 23:17–23:34). Avery testified at deposition that being sprayed

14  "was probably the most excruciating pain that [he had] ever dealt with as far as like the hotness,

15  the redness on [his] face just burning it." Dkt. No. 39 at 39. Other than the assistance they received

16  in the immediate aftermath of their exposure to the OC spray, Dkt. No. 25 at 3 (Ex. O), Avery and

17  J.A. did not seek medical attention that day, Dkt. No. 39 at 27–28. They did, however, receive

18  treatment at the hospital the next day and were prescribed topical ointments and told to follow up.

19  *Id.* at 38–39.

20  Officer Moore testified at deposition that he "deployed pepper spray on [the female

21  demonstrator] until she was no longer an active threat towards the officers," Dkt. No. 32-8 at 30,

22  and that he "just wanted her to move back," *id.* at 34; *see also id.* at 43 ("I tried to put it only on

23  her. . . . [S]he was my intended target, my intended goal."); *id.* at 35 (same). In addition, he stated

24  in his use of force report that he did not give a verbal warning prior to deploying the OC spray

because, "due to the exigent nature of the incident and how fast it was, it was not feasible to give a warning prior to using the pepper spray." Dkt. No. 24-2 at 8; *see also* Dkt. No. 32-8 at 36 (Officer Moore testifying at deposition that he "would have liked to have given a warning" but "felt at that time that the suspect that [he] had intended on pepper spraying and pepper sprayed was assaulting the officers, and [he] wanted that to stop").[6]

The City's Office of Police Accountability ("OPA") received over 13,000 complaints regarding Officer Moore's deployment of OC spray after video of J.A.'s reaction to its effects circulated via social media and garnered media attention. Dkt. No. 24-2 at 3. OPA consequently reviewed the incident and recommended that Officer Moore's use of force be found lawful and proper. *Id.* at 3, 10–12.

2. SPD's Policy and Training on Crowd Management and the Use of OC Spray

SPD Policy 8.200(1) requires any use of force by officers to be reasonable, necessary, and proportional. Dkt. No. 32-7 at 9. The Incident Commander has the authority to direct the use of OC spray to disperse a crowd. Dkt. No. 26-3 at 20 (citing Section 8.300 of the SPD Manual on use-of-force tools). Officers can only carry and use OC spray if they are trained to do so or if "otherwise directed by the Incident Commander." *Id.* "When feasible, officers will not deploy . . . OC spray until a dispersal order has been issued to the crowd and the crowd has been given a reasonable amount of time to comply." *Id.* Officers are also told to avoid deploying OC spray "in the proximity of people who are not posing a risk to public safety or property." *Id.* Officers do have the authority, though, to deploy OC spray in "crowd management situations

---

[6] Officer Moore also stated that he considered using a blast ball instead of OC spray but ultimately determined that a blast ball would affect more bystanders, while he could directly target the female demonstrator using OC spray. Dkt. No. 24-2 at 8; *see also* Dkt. No. 32-8 at 13.

involving violent activity" if they individually determine it is necessary to "[d]efend oneself," "[d]efend someone else," or "[p]revent significant destruction of property." *Id.* at 21.

SPD policy also instructs officers to deploy OC spray at a specific suspect who is posing a threat, and mandates that "[w]hen feasible, officers shall issue a verbal warning to the suspect(s), other officers, and other individuals present[] that OC spray will be used." *Id.* Officers also must, "[w]hen feasible," "wait a reasonable amount of time to allow the suspect(s) to comply with the warning before using OC spray." *Id.* Officers deploying OC spray must "attempt to limit collateral exposure to non-involved parties." *Id.* Finally, SPD policy directs officers deploying OC spray to provide aid to those exposed "if [f]easible." *Id.*

Officer Moore received and completed (1) OC spray trainings in 1994 and 2008, (2) several "use of force" trainings in 2014 and 2018, (3) "less lethal" certifications in 2015 and 2018, (4) crowd management training in 2020, and (5) blast ball training in 2020. Dkt. No. 24-2 at 29.

**B.    Procedural Background**

Avery initiated this action in April 2022, raising claims for violations of the Washington Law Against Discrimination, outrage, negligence, assault, and constitutional violations under 42 U.S.C. § 1983. Dkt. No. 1 at 1, 6–11. Following the close of discovery, the City moved to exclude the testimony of Plaintiffs' expert witness, Russ Hicks, Dkt. No. 19, and for an order granting summary judgment on all of Plaintiffs' claims, Dkt. No. 21. The parties met and conferred prior to the City's filing both motions. Dkt. No. 19 at 20; Dkt. No. 21 at 28. The Court heard oral argument on the motions on May 30, 2024. Dkt. No. 45.

**II.    DISCUSSION**

**A.    Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs allege constitutional violations under 42 U.S.C. § 1983. *See* Dkt. No. 1 at 1, 9–

11. The Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because such claims are sufficiently related to Plaintiffs' Section 1983 claims.

**B.      Motion to Exclude Expert Testimony**

The City moves to exclude the testimony of Plaintiffs' law enforcement expert, Russ Hicks, because his report contains opinions which are "improper legal conclusions and lack any expert analysis that might be helpful to a jury." Dkt. No. 19 at 1; *see* Dkt. No. 33-2 (Hicks Report). For the reasons discussed below, the Court grants the City's motion to exclude Hicks' testimony.

1. Legal Standard

An expert may testify based on his "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence," provided that the testimony rests on "sufficient facts or data" and "reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d) (2011);[7] *see also United States v. Winters*, 729 F.2d 602, 605 (9th Cir. 1984) (in order for a witness's testimony to be admissible under Rule 702, the subject matter must be "beyond the common knowledge of the average layman," the witness must have "sufficient expertise," and the state of the relevant field must "permit[] the assertion of a reasonable opinion"). The proponent of the expert testimony bears the burden of proving by a preponderance of the evidence that the testimony being proffered is admissible. *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The Court's role at this stage is that of "gatekeeper"; and at the gatekeeping stage, the relevant inquiry is limited to whether an expert's testimony "both rests on a reliable foundation and is relevant to the task at

---

[7] The Supreme Court recently adopted amendments to Federal Rule of Evidence 702, effective December 1, 2023, and ordered that said amendments govern all pending proceedings "insofar as just and practicable[.]" *See* Order Adopting Amendments to the Federal Rules of Evidence at 3 (Apr. 24, 2023), https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf; *see also* 28 U.S.C. § 2072. Because Plaintiffs submitted their expert testimony before December 2023, this Court will apply the previous iteration of Federal Rule of Evidence 702 here. However, the Court notes that its conclusion on the City's motion in this case would be the same under the current rule.

hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) ("Although a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role."). This inquiry "focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)).

Expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citation omitted). "To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu*, 26 F.4th at 1024 (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). A court must exclude any expert testimony that is not supported by any discernible reasoning or methodology. *See, e.g.*, *Rhine v. Buttigieg*, No. 2:20-CV-01761-RAJ-BAT, 2022 WL 7729817, at *3 (W.D. Wash. Sept. 15, 2022) (excluding expert who "employed no discernible methodology in reaching his opinions"), *reconsideration denied by* 2022 WL 7640272 (W.D. Wash. Oct. 13, 2022). And although "[a]n opinion is not objectionable just because it embraces an ultimate issue," *see* Fed. R. Evid. 704(a), "an expert witness cannot give an opinion as to [their] legal conclusion, i.e., an opinion on an ultimate issue of law," *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (emphasis omitted) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).

1

      2. <u>The Hicks Report is Inadmissible</u>

2

      The City does not dispute that Hicks is qualified to offer expert testimony about police

3 tactics and the appropriate use of OC spray in crowd management situations. *See generally* Dkt.

4 No. 19; *see also* Dkt. No. 33-1 at 1 (summary of Hicks' qualifications reflecting his extensive

5 experience both as a commissioned police officer and a former police academy supervisor and

6 trainer); Dkt. No. 33-2 at 1–2 (same). Instead, the City argues that the entirety of the Hicks Report

7 is inadmissible because his opinions constitute improper legal conclusions that are not justified or

8 explained by the application of relevant professional standards, and would not be helpful to a jury.

9 Dkt. No. 19 at 10, 12–19. As Plaintiffs acknowledge, Hicks improperly opines that the officers'

10 use of force was excessive and/or negligent, *see* Dkt. No. 29 at 2, 14, but they argue that "Mr.

11 Hick's [sic] expert testimony regarding [sic] is warranted and appropriate as it will aid and assist

12 the jury to determine whether the force used . . . was reasonable" or "unreasonable and excessive

13 based on SPD's practices, tactics, techniques and training that was [sic] used and employed on the

14 date of the incident that also includes SPD training manuals," *id.* at 14.

15

      The Court agrees with the City. Many of Hicks' opinions are legal conclusions. For

16 instance, Hicks repeatedly characterizes the SPD's actions as "negligent," *see* Dkt. No. 33-2 at 10,

17 12, 16–17, 19, 22, 24–25, concludes that Officer Moore's use of force was "excessive," *id.* at 15,

18 and states that Plaintiffs "were seized" by Officer Moore's use of force, *id.* at 16. And almost all

19 of Hicks' opinions are supported by nothing more than conclusory statements. *Id.* at 10

20 (concluding without citing to any supporting facts or data that it is more likely than not that an

21 SPD sergeant's "inconsiderate comments was [sic] a direct reflection of the overemployment and

22 negligent use of chemical irritants by the Seattle Police Department throughout the George Floyd

23 Protests"); *id.* at 11–12 (concluding without explanation that a decision to make a lawful arrest in

24 the crowd "was not consistent with police training, practices, and procedures," without identifying

any training, practices, or procedures that would counsel different action);[8] *id.* at 17 (opining that "Sgt. Moore's rush to the scene was negligent" and his "negligent approach and subsequent use of force was not consistent with police training, practices, and procedures" without identifying any training, practices, or procedures that would counsel different action); *id.* at 19 (concluding without elaboration that "Sgt. Moore's negligent positioning . . . was not consistent with" unidentified "police training, practices, and procedures"); *id.* (concluding that Officer Moore's approach to the police line "did not allow a reasonable assessment of what was occurring on the police line" without offering any insight as to what assessment would have been adequate or how such assessment bears on the use of force or other circumstances relevant to this case).

"Nothing in either *Daubert* or the Federal Rules of Evidence requires the district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (cleaned up). Plaintiffs rely on Hicks' deposition testimony to buttress his report, Dkt. No. 29 at 6–11, but an expert cannot salvage a deficient report by supplementing it with later deposition testimony, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008); *see also R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Under Rule 26(a), a 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial,'" and "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." (quoting *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir. 1998))); *Rapp v. NaphCare, Inc.*, No. 3:21-CV-05800-DGE, 2023 WL 3983662, at *3 (W.D. Wash. June 13, 2023). Moreover, conclusory assertions like those contained in Hicks' report would not assist the trier of fact to understand the evidence. *See Nelson v. Thurston Cnty.*, No. C18-5184-

---

[8] This opinion also arguably contradicts Hicks' later opinion criticizing the SPD for failing to arrest the female demonstrator in the bike helmet. *See id.* at 22–23.

RSL, 2022 WL 4652376, at *3 (W.D. Wash. Sept. 30, 2022) (excluding portion of report consisting of "accusations of unprofessional, unlawful, or deficient conduct" that were "largely unmoored from any standard or analysis"); *McGough v. Penzone*, No. CV-18-01302-PHX-DJH, 2021 WL 1575054, at *5 (D. Ariz. Apr. 22, 2021) (excluding expert report that "contain[ed] no discussion of policies or procedures or what a hypothetical reasonable officer would have done in Defendant['s] position" and instead "simply reiterate[d] that [Defendant's] conduct was contrary to recognized and accepted standards and policy"); *Lumberman's Mut. Cas. Co. v. DFG Restaurants*, No. SACV 05-01190-CJC (MLGx), 2008 WL 5429585, at *3 (C.D. Cal. June 16, 2008) (concluding that because an expert's report was not based on sufficient facts or data, it would "not assist the jury in resolving the factual dispute between the parties").

To the extent Hicks' opinions are based on his experience, he does not explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. For example, after acknowledging that the female demonstrator in the bike helmet had ignored seven warnings from Officer Moore to move back, Hicks speculates that it is more likely than not that if Officer Moore had provided a warning about the pepper spray, she "would have let go [of the baton] and the [sic] Sgt. Moore wouldn't have deployed this MK-9 pepper spray." Dkt. No. 33-2 at 20. Hicks provides no support whatsoever for this opinion, rendering it unreliable. Fed. R. Evid. 702 advisory committee's notes to the 2000 amendment ("The more subjective . . . the expert's inquiry, the more likely the testimony should be excluded as unreliable.").

Hicks' opinion that SPD's failure to "provide or call for aid for Mr. Avery and his 7-year-old son" was contrary to law, training, and policy is supported only by bare citation to the law and policy. Dkt. No. 33-2 at 23–25. This bare citation, coupled with his observation that "[t]he BWC's

1    [sic] do not show any Seattle Police Officers attempting to provide or call for aid," *id.* at 24, does

2    not offer any specialized knowledge and in fact contradicts the video evidence, *see* Dkt. No. 24-2

3    at 6; Dkt. No. 20-1 at 1 (Ex. A at 0:00–0:30); Dkt. No. 25 at 2 (Ex. I at 23:17–23:34). As for his

4    assertion that the alleged failure to aid is contrary to training, Hicks explains only that officers "are

5    provided with instruction on providing first aid to subjects injured by law enforcement" at

6    WSCJTC training, Dkt. No. 33-2 at 24; he does not explain how such training bears on the facts

7    at issue beyond the suggestion that officers knew *how* to administer first aid. These opinions would

8    not be helpful to the trier of fact.

9        Similarly, Hicks' opinion that Officer Moore deviated from SPD policy regarding

10   providing warnings in advance of deploying pepper spray is supported only with a citation to the

11   policy, an observation that "if Sgt. Moore had the time to give seven warnings to 'move back,' he

12   certainly had the time to give a warning that he was intending to use pepper spray," and a

13   conclusory pronouncement that Officer Moore's failure to give a warning "was below the standard

14   of care and was not consistent with police training, practices, and procedures"—again, without

15   identifying any such training, practices, or procedures other than the cited policy. *Id.* at 19–20.

16   Hicks' opinion that Officer Moore had time to give a warning is not helpful because an "untrained

17   layman would be qualified to determine . . . [that] issue without enlightenment from those having

18   a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 advisory

19   committee's notes on 1972 proposed rules (quotation marks and citation omitted); *see also*

20   *Santiago Salas v. PPG Architectural Finishes, Inc.*, No. C17-1787-RSM, 2019 WL 399029, at *1

21   (W.D. Wash. Jan. 31, 2019) ("Expert testimony is inadmissible if it concerns factual issues within

22   the knowledge and experience of ordinary lay people because it would not assist the trier of fact

23   in analyzing the evidence."); *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986) ("The

24

1    general test regarding the admissibility of expert testimony is whether the jury can receive

2    'appreciable' help from such testimony." (citation omitted)).

3        Finally, Hicks opines that Officer Moore should have used the MK-4 pepper spray instead

4    of the MK-9 because "it is possible that the smaller dispersal area [of the MK-4] would have

5    satisfied the immediate safety goal of separating an SPD officer from the protestor grabbing his

6    baton while avoiding the collateral injury to the child and others," Dkt. No. 33-2 at 22, but he cites

7    no facts or experience that support these conclusions. He points to the manufacturer's descriptions

8    indicating the effective *range* of the MK-9 and MK-4 sprays, but neither makes any mention of

9    any difference in *breadth* of spray between the two canisters. *Id.* at 21 ("The MK-9 canister has a

10   range of up to 18 feet and is generally intended to be used from farther back behind a line or to

11   reach farther into a crowd[.]"); *id.* at 22 ("The MK-4 . . . will deliver 20–25 short bursts of OC at

12   an effective range of 10–12 ft."). Hicks opines that Officer Moore used the spray from a distance

13   of exactly five feet (though it appears this is merely Hicks' estimate based on Officer Moore's

14   body-worn video), *id.* at 21, and does nothing to support his premise that the breadth of the two

15   sprays would be different at that distance. Hicks has therefore failed to "back up his opinion with

16   specific facts." *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.

17   1981).

18       For these reasons, the Court grants the City's motion to exclude Hicks' report.

19   **C.    Motion for Summary Judgment**

20       1.   Legal Standard

21       Summary judgment is appropriate only when "the movant shows that there is no genuine

22   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

23   Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

24   stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

1    evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

2    sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

3    resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

4    the facts specifically averred by that party contradict facts specifically averred by the movant, the

5    motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

6          The Court will, however, enter summary judgment "against a party who fails to make a

7    showing sufficient to establish the existence of an element essential to that party's case, and on

8    which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

9    (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

10   come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

11   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt

12   is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89.

13   Last, the Court notes that "for purposes of ruling on a motion for summary judgment, [it] may

14   properly view the facts in the light depicted by bodycam footage and its accompanying audio, to

15   the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v. Rodriguez*,

16   31 F.4th 1211, 1218 (9th Cir. 2022).

17         2.   Dismissal of the Doe Defendants is Warranted

18         As an initial matter, the City argues that Plaintiffs may not proceed against any individual

19   officer defendants because Plaintiffs never identified the "unknown officers." *See* Dkt. No. 21 at

20   10 & n.15; Dkt. No. 1 at 1. In their opposition to the City's motion, Plaintiffs do not dispute that

21   they failed to move to amend to substitute any individual officer for a named Doe Defendant, even

22   after learning of Officer Moore's and Captain Kibbee's identities during discovery. Dkt. No. 31 at

23   8, 11. Plaintiffs' contention that the City "declined to allow the Plaintiff[s] to amend the pleadings"

24   does not excuse this failure. *Id.* at 8. Under the Federal Rules of Civil Procedure, a party may

1   amend its pleading with *either* "the opposing party's written consent *or* the court's leave." Fed. R.

2   Civ. P. 15(a)(2) (emphasis added). Plaintiffs provide no reasonable explanation as to why they did

3   not seek to amend their complaint after learning of the Doe Defendants' identities. *See Kuhlmann*

4   *v. Christianson*, No. 1:14-CV-01042-BAM, 2015 WL 5008976, at *2 (E.D. Cal. Aug. 20, 2015)

5   (finding that "there is no indication that Plaintiff was diligent in seeking an amendment to

6   substitute individuals for the doe defendants" where he "made no effort to add these defendants

7   prior to the . . . deadline to amend" and did not "make any effort to extend the deadline to amend

8   during the course of litigation").

9          Accordingly, the Court dismisses Plaintiffs' claims against the Doe Defendants. *See Brass*

10  *v. Cnty. of Los Angeles*, 328 F.3d 1192, 1197–98 (9th Cir. 2003) (affirming refusal of district court

11  to permit plaintiff's addition of discovered defendants when plaintiff "ha[d] not even attempted to

12  request leave from the Court to add new parties or to file an amended complaint"); *Drewry v. Cnty.*

13  *of Riverside*, No. EDCV-20-2554-JGB (SHKx), 2023 WL 2627740, at *6 (C.D. Cal. Jan. 23, 2023)

14  (dismissing all claims against Doe defendants where, "[d]espite ample opportunity," plaintiff

15  failed to move "to amend the complaint to name any doe defendant," and the deadline to add

16  parties to the complaint had passed); *Bradford v. City of Seattle*, 557 F. Supp. 2d 1189, 1207–08

17  (W.D. Wash. 2008) ("Because plaintiff has had the opportunity to identify the John Doe defendants

18  but has failed to perfect claims against them, these defendants must be dismissed.").

19          3.   The City is Entitled to Summary Judgment on Plaintiffs' *Monell* Claim

20          Because the City is the only named defendant in this action, Plaintiffs must meet the

21  relevant standards for establishing municipal liability under *Monell v. Department of Social*

22  *Services of the City of New York*, 436 U.S. 658 (1978) in order to proceed on their federal claims.

23  The City contends that Plaintiffs' *Monell* claim should be dismissed because Plaintiffs' "shotgun"

24

approach to establishing *Monell* liability fails as a matter of law. Dkt. No. 21 at 10–16. The Court agrees.

In *Monell*, the Supreme Court held that municipalities may only be held liable under Section 1983 for constitutional violations resulting from official policy or custom. 436 U.S. at 694. However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Thus, the imposition of *Monell* liability on a municipality under Section 1983 generally occurs in three situations: (1) when the municipality acts pursuant to an expressly adopted official policy; (2) when the municipality acts pursuant to a longstanding practice or custom, including when it fails to train its employees adequately; and (3) when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021); *see also Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013); *Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976, 992 (C.D. Cal. 2022).

Plaintiffs allege in their complaint that the City's unconstitutional conduct "[w]as undertaken pursuant to [its] policies, practices, and customs" in the following ways: (1) through approval, or "ratification" of the officers' actions, (2) through its failure to adequately train, supervise, control, investigate, and discipline its officers, and (3) through its problematic written polices pertaining to crowd control and rallies. Dkt. No. 1 at 10–11. The City asserts that Plaintiffs (1) cannot demonstrate that the City's training policies reflect a deliberate or conscious choice with respect to neglecting citizens' constitutional rights; (2) have "fail[ed] to identify any specific policies or customs that were the direct cause of the alleged constitutional violations in this case"; and (3) "cannot demonstrate that the relevant policy maker reviewed this matter or adopted the actions of the officers as official City policy," as necessary to support a theory of ratification. Dkt.

No. 21 at 15–16; *see also* Dkt. No. 34 at 7–8. The Court agrees. Even assuming that Plaintiffs have established a constitutional violation, they fail to muster a triable issue of fact for trial on their *Monell* claim.

### (a) Plaintiffs' Failure to Train Theory Fails

Plaintiffs first assert that the City is responsible for their injuries because it failed to adequately train Officer Moore. Dkt. No. 31 at 15–16. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Inadequate training "may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury," if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Under this standard, Plaintiffs must show that the City "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (cleaned up). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The City argues that Plaintiffs' "sweeping general assertions" that its failure to train encouraged constitutional violations cannot establish a municipal policy or custom because Plaintiffs do not point to more than isolated allegedly unconstitutional behavior by employees. Dkt. No. 21 at 15–16. Plaintiffs respond that "the City failed to properly training [sic] and provided inadequate training to Moore in safety training with OC spray, properly [sic] handling of OC spray,

1  training of contact and body positioning prior to deploying OC spray, [and] how to approach and

2  then go forward to the line to assist other officers." Dkt. No. 31 at 16.

3      But Plaintiffs do not elaborate on or adduce any evidence indicating what particular

4  deficiencies Officer Moore's training suffered from that would bear on the facts of this case, or

5  attempt to show "a pattern of similar constitutional violations by untrained employees"—

6  something that is "ordinarily necessary to demonstrate deliberate indifference for purposes of

7  failure to train[.]" *Flores*, 758 F.3d at 1159 (quoting *Connick*, 563 U.S. at 62); *accord Vanegas v.*

8  *City of Pasadena*, 46 F.4th 1159, 1167 (9th Cir. 2022). For example, while the record indicates—

9  and Plaintiffs do not dispute—that Officer Moore received several relevant trainings, Dkt. No. 24-

10 2 at 29, Plaintiffs complain that he "was not trained on practical applications for OC spray for

11 several years," Dkt. No. 31 at 16, without identifying what a proper training interval might be.[9]

12     Nor do Plaintiffs show that their failure to train claim "fall[s] within the narrow range of

13 circumstances in which a pattern of similar violations might not be necessary to show deliberate

14 indifference," e.g., where "the unconstitutional consequences of failing to train could be so

15 patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of

16 violations." *Flores*, 758 F.3d at 1159 (cleaned up). The most Plaintiffs point to is Captain Kibbee's

17 testimony that he does not recall if SPD trains officers to "deploy [OC] spray" near an officer's

18 ear," Dkt. No. 31 at 6–7 (quoting Dkt. No. 32-10 at 23–24), and that he "was not aware whether

19

20

21 _____

[9] The Court notes that Plaintiffs' citation for this proposition is to the entirety of Officer Moore's 107-page deposition,

22 violating the requirement that parties "cite the page and line of any part of the transcript or record to which their
   pleadings, motions or other filings refer." LCR 10(e)(6). This is not an isolated occurrence; Plaintiffs repeatedly fail

23 to provide specific citations to the record—and often provide no citations at all. *See, e.g.*, Dkt. No. 31 at 15–16. The
   Court declines to "search for evidence or manufacture arguments" for them. *Ayers v. Richards*, No. C08-5390
   BHS/KLS, 2010 WL 4366069, at *2 (W.D. Wash. Aug. 3, 2010), *report and recommendation adopted*, 2010 WL

24 4365555 (W.D. Wash. Oct. 28, 2010); *see also Ramsey v. Muna*, 819 F. App'x 505, 507 (9th Cir. 2020) (courts "are
   not like pigs, hunting for truffles buried in briefs[,] and cannot manufacture arguments for a [litigant]" (cleaned up)).

there was training about how many lethal weapons an officer should have in his hands," *id.* at 16 (citing the entirety of Captain Kibbee's 87-page deposition).

"Although inadequacy of police training may serve as the basis for municipal liability in certain circumstances, the evidence presented by [plaintiff] does not support such a claim, nor can liability be predicated on the isolated sporadic events in this case." *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 931–32 (9th Cir. 2001). Because Plaintiffs have failed to raise a genuine issue for trial regarding whether the City failed to adequately train Officer Moore, the Court grants summary judgment on this aspect of their *Monell* claim.

### (b) Plaintiffs' Official Policy, Practice, or Custom Theory Fails

To the extent Plaintiffs intended to pursue an official policy, practice, or custom claim under *Monell*, they do not sufficiently support such a theory. Without citing to any record evidence, Plaintiffs contend that Officer Moore "was taught and believed that he was allowed to use and deploy OC spray at a crowd to dis[perse] them, allowing his use of force," and that "he could violate the Seattle Police Manual['s policy] of giving a warning" before doing so because SPD's culture "allowed it and said as long as officers had a subjective belie[f that a warning] was not feasible[,] that was sufficient." Dkt. No. 31 at 17. Plaintiffs do not, however, allege or cite to evidence suggesting that any official SPD policy was the moving force behind their injury. *See* Dkt. No. 1 at 10–11; Dkt. No. 31 at 15–17.

Furthermore, because Plaintiffs only identify this isolated incident, as opposed to repeated similar conduct, they fail to establish a genuine dispute as to the existence of an unconstitutional SPD custom. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section

1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.").[10] Accordingly, because Plaintiffs point to no evidence in the record demonstrating that the City's official policy or "persistent and widespread" custom served as the moving force behind their constitutional claims, the Court grants summary judgment to the City on this theory of municipal liability. *Monell*, 436 U.S. at 691; *Trevino*, 99 F.3d at 920.

### (c)  Plaintiffs' Ratification Theory Fails

Plaintiffs further attempt to cast their *Monell* claim under a theory of ratification. "A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004); *see also Fortson*, 628 F. Supp. 3d at 992. "To show ratification, a plaintiff must show that the 'authorized policymakers approve a subordinate's decision and the basis for it,'" and "[t]he policymaker must have knowledge of the constitutional violation and actually approve of it." *Lytle*, 382 at 987 (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)). "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Id.*; *see also Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 788 (9th Cir. 2022). Ratification requires an authorized policymaker to make a "conscious, affirmative choice" to endorse a subordinate's actions. *Gillette*, 979 F.2d at 1346–47; *accord City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

---

[10] Plaintiffs' reference to the 2012 Consent Decree the City entered into with the U.S. Department of Justice is unavailing. *See* Dkt. No. 31 at 2–3; Dkt. Nos. 32-1, 32-2. Simply showing the existence of the Consent Decree is insufficient to establish evidence of any current SPD policies or customs supporting a claim of municipal liability under Section 1983. *Cf. Sims v. City of Seattle*, No. 2:22-cv-00483-TL, 2023 WL 3619019, at *7 (W.D. Wash. May 24, 2023) ("While Plaintiff has pled the existence and continued enforcement of the Consent Decree, he does so in a conclusory manner and does not plead factual allegations—beyond his single incident—regarding the contemporary policies or behavior of the SPD that would support a finding that Plaintiff faces a realistic threat of a repeated violation like the one he alleges.").

Plaintiffs argue that the City "ratified Moore's behavior by informing and advising him [that] his behavior was allowed" and "because no disciplinary action was taken against him." Dkt. No. 31 at 16. Plaintiffs also speculate that "Moore could have been comfortable enough to conduct himself in the manner he did because this was an acceptable form of conduct at SPD," which "supports the inference of ratification because a police department culture that allows officers to violate the Seattle Police Manual even when they have 'proper' training is approval of such conduct." *Id.* Plaintiffs, once again, cite to no evidence to support their claims; they do not identify who the final policymaker in this situation would be, *see* Dkt. No. 21 at 16, and produce no evidence raising an inference that any individual at the City or SPD affirmatively sanctioned Officer Moore's actions before or after the incident. Furthermore, the record shows that OPA investigated Officer Moore in the fall of 2020 in relation to this incident. *See* Dkt. No. 24-2 at 2–38.

Therefore, the Court grants summary judgment in favor of the City on this theory of *Monell* liability. *See, e.g.*, *Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2023 WL 2562400, at *25 (N.D. Cal. Mar. 16, 2023); *Robinson v. Cnty. of Shasta*, 384 F. Supp. 3d 1137, 1161 (E.D. Cal. 2019).

* * *

For these reasons, the Court grants the City's motion for summary judgment on Plaintiffs' Section 1983 claims.

4.  <u>The City is Entitled to Partial Summary Judgment on Plaintiffs' State Law Claims</u>

The City also moves for summary judgment on Plaintiffs' claims for negligence, assault, WLAD violations, and outrage. Dkt. No. 21 at 16–28; Dkt. No. 34 at 8–11.[11] For the reasons stated

---

[11] The City does not dispute that Officer Moore was acting within the scope of his employment when he deployed the

below, the Court grants summary judgment on Plaintiffs' WLAD and outrage claims, but finds that issues of fact preclude granting summary judgment on Plaintiffs' negligence and assault claims.

### (a) The City's Motion is Denied as to Plaintiffs' Negligence Claim

In its motion, the City claims that the public duty doctrine shields it from Plaintiffs' negligence claim, Dkt. No. 9 at 11; Dkt. No. 21 at 17–19, and that in any event, Plaintiffs fail to establish a prima facie case for negligence, Dkt. No. 21 at 16–17, 19–22. The Court concludes that the public duty doctrine does not bar Plaintiffs' negligence claim and that issues of fact preclude granting summary judgment to the City on this claim.

### (i) The Public Duty Doctrine Does Not Apply

"The public duty doctrine recognizes that governments, unlike private persons, are tasked with duties that are not actionable duties within the meaning of tort law." *Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 613–14 (Wash. 2019). "To establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public." *Id.* at 614. "The public duty doctrine operates as 'a focusing tool' to ensure that governmental entities may be held liable only 'to the *same* extent as if they were a private person or corporation.'" *Norg v. City of Seattle*, 522 P.3d 580, 585 (Wash. 2023) (quoting *Ehrhart v. King Cnty.*, 460 P.3d 612, 618 (Wash. 2020) and Wash. Rev. Code § 4.96.010(1)). Notably, "the public duty doctrine is inapplicable to common law negligence claims, even if a governmental entity is the defendant," *id.*, and government actors therefore do not enjoy the protections of the public duty doctrine for such claims resulting from "affirmative

---

complained-of OC spray. *See generally* Dkt. Nos. 21, 34. Therefore, the Court reviews Plaintiffs' state law allegations through the lens of respondeat superior, even though the individual officers have been dismissed as defendants. *See, e.g.*, *Miller v. Monroe Sch. Dist.*, 159 F. Supp. 3d 1238, 1253 (W.D. Wash. 2016).

acts of misfeasance," *Beltran-Serrano*, 442 P.3d at 614. As the Washington Supreme Court has explained:

> Our decisions recognize a difference in the public duty doctrine context between "misfeasance" and "nonfeasance." Unlike government actors in many public duty doctrine cases who fail to protect a plaintiff from harm caused by a third party or entity, the police in this case personally caused the harm of which [plaintiff] complains. In such a case of affirmative misfeasance, all individuals have a duty to exercise reasonable care[.]

*Mancini v. City of Tacoma*, 479 P.3d 656, 667–68 (Wash. 2021) (internal citations omitted); *see also, e.g.*, *id.* at 668 (officers executing a search warrant "were bound by a duty to exercise reasonable care"; "[t]his was not an abstract duty to the nebulous public, but a specific duty enforceable by [plaintiff] in tort" and thus "[t]he public duty doctrine d[id] not apply"); *Norg*, 522 P.3d at 589 (public duty doctrine did not apply where plaintiffs alleged the City breached its common law duty to exercise reasonable care when responding to their 911 call for emergency assistance); *Beltran-Serrano*, 422 P.3d at 614–15 (public duty doctrine did not apply where plaintiff claimed officer failed to use ordinary care in lead-up to using deadly force during encounter).

In short, "[i]f the duty is based on the common law and owed to the [plaintiff] individually, then the public duty doctrine does not apply[.]" *Norg*, 522 P.3d at 585; *see also Watness v. City of Seattle*, 481 P.3d 570, 578 (Wash. Ct. App. 2021) ("[W]hen a police officer has a direct interaction with a plaintiff, that officer has a duty to act with reasonable care."). But "[i]f the duty is based on a statute and owed to the public generally, then the public duty doctrine applies and [the court] must determine whether there are any applicable exceptions." *Norg*, 522 P.3d at 585–86. Whether the duty is based on common law or a statute depends on what duty Plaintiffs claimed was breached. *Compare Cummins v. Lewis Cnty.*, 133 P.3d 458, 459, 462 n.6 (Wash. 2006) (holding that public duty doctrine applied because plaintiff asserted statutory duty under Wash. Rev. Code

§ 38.52.500), *with Norg*, 522 P.3d at 586–87 (distinguishing *Cummins* in case based on common law negligence claim).[12]

Here, Plaintiffs allege that the Defendant officers had a duty of care to "persons with whom they foreseeably interact[ed]," and that they breached "their duty to protect the plaintiff's [sic] when they unjustifiably sprayed them with pepper spray." *See* Dkt. No. 1 at 8. These allegations assert a duty owed specifically to Plaintiffs rather than to the public at large: the duty of reasonable care to refrain from negligently spraying Plaintiffs with pepper spray when they were not the intended targets. *Beltran-Serrano*, 442 P.3d at 614 (the common law duty to refrain from negligent conduct "encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance"). Although the City argues that "Plaintiffs had no direct interaction with SPD," Dkt. No. 21 at 18, 19 n.26, a reasonable trier of fact could conclude otherwise based upon the video evidence. Therefore, the Court finds that the public duty doctrine does not bar Plaintiffs' negligence claim. *See, e.g.*, *Contreraz v. City of Tacoma*, No. 3:22-CV-05106-JNW, 2024 WL 1138902, at *7 (W.D. Wash. Mar. 15, 2024); *Clauson v. Thurston Cnty.*, No. 3:22-CV-05025-RJB, 2023 WL 8369473, at *7 (W.D. Wash. Dec. 4, 2023); *Hanks v. Clark Cnty.*, No. 3:22-CV-05359-DGE, 2023 WL 4623977, at *11 (W.D. Wash. July 19, 2023); *Dold v. Snohomish Cnty.*, 649 F. Supp. 3d 1084, 1113–14 (W.D. Wash. 2022), *reconsideration denied*, No. 2:20-CV-00383-JHC, 2023 WL 1818139 (W.D. Wash. Feb. 7, 2023).

*(ii)* Issues of Fact Preclude Summary Judgment on Plaintiffs' Negligence Claim

To recover on a common law negligence claim, "a plaintiff must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the

---

[12] There are also four exceptions to the public duty doctrine: "(1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship." *Norg*, 200 Wash. 2d at 758 (citation omitted). Because the Court concludes that the public duty exception does not apply, it does not address whether an exception applies. *See id.* ("[A]n enumerated exception is not always necessary to find that a duty is owed to an individual and not to the public at large because the public duty doctrine does not apply to every tort claim against a governmental entity." (citation omitted)).

proximate cause of the injury." *Ehrhart.*, 460 P.3d at 617 (quotation marks and citation omitted). The City argues that the Court should award it summary judgment on Plaintiffs' claim for three reasons. Dkt. No. 21 at 19–23. First, the City contends that Plaintiffs cannot demonstrate that Officer Moore's deployment of OC spray fell below the recognized standard of care. *Id.* at 19–20. Second, relying on video and photographic evidence, the City maintains that Plaintiffs cannot establish that J.A.'s injuries were proximately caused by Officer Moore. *Id.* at 20–22. And third, the City contends that Avery assumed the risk of being impacted by pepper spray and "voluntarily chose to encounter that risk," barring their negligence claim as a matter of law. *Id.* at 22–23, 27 n.32.

Though the Court agrees with the City that Plaintiffs could have done a better job "discussing the evidence and applying it to a negligence theory," Dkt. No. 34 at 9, it nevertheless concludes that Plaintiffs have identified sufficient issues of fact to preclude summary judgment here.

Under Washington law, police officers are held to a "reasonable care" standard when discharging their official duties, *see Mancini*, 479 P.3d at 879 (citing *Beltran-Serrano*, 442 P.3d at 614), and the City has not demonstrated the absence of a genuine dispute as to whether Officer Moore's decision to deploy OC spray was "reasonable" under the circumstances, *see, e.g.*, Dkt. No. 25 at 3 (Ex. J at 7:07–7:24); Dkt. No. 24-2 at 5; *see also* Fed. R. Civ. P. 56(a). Although a jury may well find for the City based on the evidence at trial, Plaintiffs have carried their burden to show a triable issue of fact as to whether Officer Moore's use of OC spray without a warning fell below the standard of care. Plaintiffs argue that the evidence indicates it would have been feasible for Officer Moore to provide a warning prior to deploying the spray, as required by the Seattle Police Department Manual. Dkt. No. 31 at 5–6 (citing Officer Moore's deposition testimony that it was feasible for him to say "move back" seven times during the same time span, Dkt. No. 32-8

at 37, as well as Captain Kibbee's testimony that it may or may not have been feasible to provide a warning before deploying OC spray, Dkt. No. 32-10 at 30). Plaintiffs also contend that video of the incident shows that Plaintiffs "did nothing to warrant having OC spray shot at them." *Id.* at 22. With respect to proximate cause, Plaintiffs refer to the OPA report indicating that "at th[e] point" that the female demonstrator in the bike helmet "ducked and turned around" in response to the spray, "[i]t appears that . . . a quantity of pepper spray affected the Father and Child." Dkt. No. 31 at 4 (quoting Dkt. No. 32-7 at 9). "[P]roximate cause is ordinarily a jury question," *Beard v. Mighty Lift, Inc.*, 224 F. Supp. 3d 1131, 1136 (W.D. Wash. 2016) (citing *Ruff v. Cnty. of King*, 887 P.2d 886, 889 (Wash. 1995)), and despite the City's arguments to the contrary, *see* Dkt. No. 21 at 20, whether J.A. experienced the effects of the OC spray as a result of Avery touching his face or as a result of Officer Moore's deployment is not conclusively shown by the video evidence. In other words, the Court cannot say that a reasonable factfinder could not conclude from the record that Officer Moore's spray reached J.A. directly. Last, whether Avery assumed the risk of being pepper sprayed is likewise a question for the jury. *See, e.g.*, *Pellham v. Let's Go Tubing, Inc.*, 398 P.3d 1205, 1214 (Wash. Ct. App. 2017) (explaining that "[i]n the usual case, [a plaintiff's] knowledge and appreciation of the danger will be a question for the jury," and only "where it is clear that any person in his or her position must have understood the danger," may "the issue may be decided by the court").

In sum, based on the evidence in the record, the Court cannot conclude that no reasonable juror could find Officer Moore's interactions with Plaintiffs were negligent. *Hanks*, 2023 WL 4623977, at *11; *Dold*, 649 F. Supp. 3d at 1113–14.

> *(b) The City's Motion is Denied as to Plaintiffs' Assault Claim*

Under Washington law, a "defendant may be liable for assault when he or she acts with an intent to put another person in immediate apprehension of harmful or offensive contact, and that

person has such an apprehension." *Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 767 (Wash. Ct. App. 2014) (citing *Brower v. Ackerley*, 943 P.2d 1141, 1144–45 (Wash. Ct. App. 1997)); *see also Jurkowski v. City of Seattle*, No. C15-1155-TSZ, 2017 WL 4472859, at *7 (W.D. Wash. Oct. 5, 2017) ("In the civil context, an assault is an inchoate battery.").[13] The City argues that it is entitled to judgment as a matter of law on Plaintiffs' claim because "[f]orce is lawful in Washington 'when necessarily used by a public officer in the performance of a legal duty,'" and Officer Moore's use of force was both reasonable as a matter of law and a proportional response to the female demonstrators physically engaging with the officers. Dkt. No. 21 at 26–27 (quoting Wash. Rev. Code § 9A.16.020(1)). Plaintiffs counter that the City is not entitled to summary judgment on their assault claim "for the same reason it is not entitled to summary judgment on their negligence claims—an issue of fact exists as to the reasonableness of the force that injured Plaintiffs." Dkt. No. 31 at 25.

As the City points out, "[t]o prove an assault plaintiffs must show any act that causes an imminent apprehension of a battery." Dkt. No. 21 at 26 (citing *Brower*, 943 P.2d at 1144); *see also Garratt v. Dailey*, 279 P.2d 1091, 1093–94 (Wash. 1955). Plaintiffs do not allege such apprehension in their complaint, nor do they identify any apprehension in their response to the City's motion for summary judgment. *See generally* Dkt. Nos. 1, 31. Nevertheless, the City does not seek summary judgment on this basis. Instead, it argues that "[a]ny harm (or the apprehension thereof) suffered by Plaintiff[s] is not actionable because the conduct was privileged and did not create an unreasonable risk of harm." Dkt. No. 21 at 27. This rationale mirrors the basis for the City's motion for summary judgment on Plaintiffs' negligence claim, and for the same reasons the

---

[13] Battery is a separate tort claim in Washington, and defined as "the intentional infliction of harmful or offensive bodily contact with the plaintiff." *Sutton*, 324 P.3d at 766 (citing *Morinaga v. Vue*, 935 P.2d 637, 644 (Wash. Ct. App. 1997)); *see also Hanks*, 2023 WL 4623977, at *11 n.15. Plaintiffs are pursuing only an assault claim. *See* Dkt. No. 1 at 11 ("[A]ll defendants are liable for assault of the plaintiffs.").

ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY AND MOTION FOR SUMMARY JUDGMENT - 29

Court denied that portion of the City's motion, it finds that genuine issues of material fact preclude summary judgment on Plaintiffs' assault claim.

### (c)  The City's Motion is Granted as to Plaintiffs' WLAD Claim

The WLAD secures the right of the people to enjoy places of public accommodation without discrimination. Wash. Rev. Code § 49.60.030(1)(b); *see also id.* § 49.60.215. In order to succeed on a WLAD claim, a plaintiff must make a prima facie case of discrimination. This requires proof that:

> (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

*Floeting v. Grp. Health Coop.*, 434 P.3d 39, 41 (Wash. 2019). Summary judgment is appropriate when a plaintiff fails to raise a genuine issue of fact as to one or more these four essential elements. *Harteben v. Univ. of Wash.*, 378 P.3d 263, 266 (Wash. Ct. App. 2016).

Plaintiffs, who are Black, argue that "Defendants discriminated against [them] because of their race [and because they] were advocating for victims of police brutality." Dkt. No. 31 at 26. At deposition, Avery also testified that he felt "targeted." Dkt. No. 39 at 16. But Plaintiffs fail to adduce any evidence that their protected status was a substantial factor that caused the discrimination. The Court therefore grants summary judgment to the City on Plaintiffs' WLAD claim. *See, e.g.*, *Hernandez v. Fed. Way*, 456 F. Supp. 3d 1228, 1249 (W.D. Wash. 2020) (dismissing WLAD claim because plaintiff provided "no factual evidence—whatsoever—to support her claim that the officers took any action due to [plaintiff's] Latino ethnicity").

### (d)  The City's Motion is Granted on Plaintiff's Outrage Claim

"The basic elements of the tort of outrage are: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of

severe emotional distress." *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989). "[M]ere negligence is not enough," nor is it sufficient that the "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; "[l]iability exists only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975) (cleaned up). And while "[t]he question of whether certain conduct is sufficiently outrageous is ordinarily for the jury," the court must initially "determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Dicomes*, 630, 782 P.2d at 1013. In making this determination, a court must consider the following factors: (1) the position occupied by the defendant; (2) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendant knew this fact; (3) whether the defendant's conduct may have been privileged under the circumstances; (4) the degree of emotional distress caused by the defendant and whether it was severe as opposed to mere annoyance, inconvenience or the embarrassment which may normally occur in a confrontation of the parties; and (5) whether the defendant was aware that there was a high probability that his conduct would cause severe emotional distress and whether he proceeded in a conscious disregard of that likelihood. *Birklid v. Boeing Co.*, 904 P.2d 278, 286 (Wash. 1995) (citation omitted).

The City argues that Plaintiffs' outrage claim fails as a matter of law because "there is no evidence that anyone *intended* to cause Plaintiff[s] severe emotional distress," and because Plaintiffs have not "provide[d] any meaningful evidence of severe persistent emotional harm[.]" Dkt. No. 21 at 25. In response, Plaintiffs offer only conclusory statements that they are

"traumatized from this situation," felt "shock and agony," and "must now live with emotional and mental anguish as a result of this incident." Dkt. No. 31 at 17–18.

The Court finds that "[r]easonable jurors could not conclude that . . . the physical force used here was so unconscionable as to rise to the level of outrage, nor is there evidence of severe emotional distress suffered by the plaintiff." *Monetti v. City of Seattle*, 875 F. Supp. 2d 1221, 1231 (W.D. Wash. 2012); *see also, e.g.*, *Johnson v. City of Olympia*, No. C17-5403-MJP, 2018 WL 4681554, at *3 (W.D. Wash. Sept. 28, 2018); *Roufa v. Constantine*, No. C15-1379-JLR, 2017 WL 120601, at *10 (W.D. Wash. Jan. 11, 2017). Accordingly, the Court grants the City's motion for summary judgment as to Plaintiffs' outrage claim.

### III.  CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.  The Court GRANTS the City's Motion to Exclude Expert Testimony. Dkt. No. 19.

2.  The Court GRANTS IN PART and DENIES IN PART the City's Motion for Summary Judgment, Dkt. No. 21.

3.  Within 21 days of this Order, the parties are ORDERED to meet and confer and to submit a proposed schedule for trial and the remaining pretrial deadlines.

Dated this 12th day of June, 2024.

Lauren King
United States District Judge